IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| YOUNGSTOWN PUBLISHING. COMPANY, et al., | ) | CASE NO.  4:05 CV 00625 |
| | ) | |
| Plaintiffs, | ) | JUDGE PETER C. ECONOMUS |
| | ) | |
| v. | ) | |
| | ) | |
| GEORGE M. McKELVEY, et al. | ) | MEMORANDUM OPINION |
| | ) | AND ORDER |
| Defendants. | ) | |

This matter is before the Court upon the Plaintiff, Youngstown Publishing Company d/b/a/ *The Business Journal's* Motion For Preliminary injunction asserted against Defendants, George M. McKelvey, and the City of Youngstown.  (Dkt. # 3).  Also before the Court is Defendants' Motion to Dismiss (Dkt. #14).

## I.  FACTUAL BACKGROUND

On February 24, 2005, Plaintiffs, Youngstown Publishing Company d/b/a *The Business Journal*, Andrea Wood, W. Daniel O'Brien, George Nelson, and Dennis LaRue (collectively "*The Business Journal*") filed a Complaint with this Court naming George M. McKelvey ("Mayor McKelvey") and the City of Youngstown ("the City") as Defendants. (Dkt. #1, Complaint).  The Complaint alleges the following facts:

Mayor McKelvey is the mayor for the city of Youngstown, Ohio.  (Complaint ¶ 10).

*The Business Journal* is a bimonthly newspaper of general circulation published in Youngstown, Ohio, (Complaint ¶¶   2, 5), and regularly publishes articles covering Youngstown City government, including actions taken by Mayor McKelvey and his administration.   (Complaint ¶   13).   Beginning in February 2003, *The Business Journal* published articles criticizing the actions of Mayor McKelvey and his administration in planning and constructing a convocation center.   (Complaint ¶ 15).   In mid-February 2003 Mayor McKelvey issued an oral directive to various City officials instructing them not to speak with reporters from *The Business Journal*.   (Complaint ¶ 16).   City officials, thereafter, repeatedly denied employees of *The Business Journal* information concerning the convocation center project.   (Id.).   In response, *The Business Journal* issued a series of public records requests to obtain information on the convocation center project.   (Complaint ¶ 17).   The City failed to produce the requested records, and *The Business Journal* initiated a mandamus proceeding seeking to compel the City to release the public records at issue. (Complaint ¶ 17).   During the pendency of the mandamus action the City fully complied with the public records request.   (Dkt. #4, exhibit A, Magistrate Decision at 2–3).   On December 22, 2004, a magistrate for the Mahoning County Court of Common Pleas issued an opinion ordering the City to pay the *The Business Journal*'s attorney's fees.[1]   (Complaint ¶ 18; Dkt. #4, exhibit A, Magistrate Decision).

Shortly after the magistrate's decision, employees of *The Business Journal* again received refusals from City officials to provide any information.   (Complaint ¶ 19).   On

---

[1]A judge for the Common Pleas Court subsequently vacated the magistrate's award of attorney's fees.  (Dkt. #15, Exhibit B).

February 4, 2005, Mayor McKelvey addressed a letter to Andrea Wood, publisher of *The Business Journal,* notifying her of a City policy (the "No-Comment Policy") forbidding City of Youngstown employees ("City employees") from communicating with *Business Journal* reporters and representatives about any City business. (Complaint ¶ 20). The letter stated:

> The following statements accurately reflect my policy and philosophy regarding the separate issues of **Public Records** and **Speaking to the Press**. Any representation to the contrary should be considered a reckless disregard of the truth or falsity of the statement; irresponsible; a distortion of my comments; and being made with "actual malice."
>
> ### Public Records
>
> As Mayor of the City of Youngstown I have always recognized that Ohio's Public Records Act requires the City of Youngstown to make available all public records to any person, unless the record falls within one of the statute's enumerated exceptions. **As Mayor of the City of Youngstown (since January 1, 1998) I have always expected 100% compliance with Ohio's Public Reocrds Act**. I have always required my employees to adhere to my policy and philosophy that public records are the people's records. The aforementioned policy and philosophy shall continue throughout my tenure as Mayor of Youngstown.
>
> ### Speaking to the Press
>
> As Mayor of Youngstown, I do not dispute that I have instructed members of my administration not to make statements to *The Business Journal* **except to fulfill the City's obligations regarding public records requests**....I have made the determination that City administrators and employees may not comment to *The Business Journal* on behalf of the City.

(Complaint, Exhibit A). Since instituting this No-Comment Policy, City employees contacted by *The Business Journal* have refused to speak with its reporters. (Complaint ¶ 22).

Plaintiffs' Complaint asserts an action pursuant to 42 U.S.C. § 1983 and alleges

3

Defendants unlawfully retaliated against *The Business Journal* for exercising its rights under the First Amendment.   Immediately after filing the Complaint, Plaintiffs filed the instant Motion For Preliminary Injunction asking the Court to enjoin Mayor McKelvey and the City from enforcing the No-Comment Policy.  (Dkt. #4).  During a teleconference with the Court, the parties agreed that the case presented only issues of law and Defendants indicated their intention to file a motion to dismiss.  (Dkt. #12).  The Court, then, in lieu of holding an evidentiary hearing, set a briefing schedule on disputed issues of law.  (Id.). Defendants subsequently filed the instant Motion to Dismiss alleging Plaintiffs' Complaint fails to state a claim upon which relief can be granted.  (Dkt. #14).

## II. PRELIMINARY INJUNCTION

In determining whether to issue a preliminary injunction, the district court must consider: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction." McPherson v. Michigan High Sch. Athletic Ass'n, 119 F.3d 453, 458 (6th Cir.1995).  "The four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met." Six Clinics Holding Corp., II v. Cafcomp Systems, 119 F.3d 393, 400 (6th Cir.1997) (citing Washington v. Reno, 35 F.3d 1093, 1099 (6th Cir.1994)).  "No single factor will be determinative as to the appropriateness of equitable relief, . . . and the district court's weighing and balancing of the equities is overruled only in the rarest of cases." Id.

4

(internal quotation marks and citations omitted).  Finally, "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." Id.

### Likelihood of Success on the Merits

Plaintiffs' Complaint alleges that Defendants unlawfully retaliated against *The Business Journal* in response to its exercise of rights protected under the First Amendment. In order to establish retaliation for engaging in constitutionally protected activity, a plaintiff must establish: (1) that the plaintiff was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of plaintiff's constitutional rights.  Farmer v. Cleveland Public Power, 295 F.3d 593, 599 (6th Cir. 2002) (citing Bloch v. Ribar, 156 F.3d 673, 678 (6th Cir. 1998)).

To establish a likelihood of success on the merits of their claim, Plaintiffs broadly argue that *The Business Journal* was engaged in the constitutionally protected activity of publishing news reports which questioned the actions of local government officials on a matter of great public importance.  See New York Times Co. v. Sullivan, 376 U.S. 254, 269–71 (1964).  According to Plaintiffs, the No-Comment Policy is an attempt to prevent *The Business Journal* from engaging in this activity and is motivated by Mayor McKelvey's displeasure with *The Business Journal*'s reporting.  Plaintiffs specify that Defendants' adverse action—the No-Comment Policy—denies *The Business Journal* the ability to

5

engage in "the daily give-and-take of information with government employees," which is "its stock in trade."  (Dkt. #3, Memorandum in Support at 4).  As part of its retaliation claim, therefore, *The Business Journal* must first demonstrate that this "give-and-take of information" in the form of one-on-one interviews with and comments from City employees, is a constitutionally protected activity.  See <u>Farmer</u>, 295 F.3d at 599.

### *First Amendment Right of Access to Information*

The First Amendment protects the right to receive information.  <u>Stanley v. Georgia</u>, 394 U.S. 557 (1969) ("It is now well established that the Constitution protects the right to receive information and ideas.").  <u>Accord</u> <u>Neinast v. Board of Trustees of Colombus Metropolitan Library</u>, 346 F.3d 585, 591 (6th Cir. 2003).  The First Amendment, however, "does not guarantee the press a constitutional right of special access to information not available to the public generally."  <u>Branzburg v. Hayes</u>, 408 U.S. 665, 728 (1972).  "There is an undoubted right to gather news from any source by means within the law, but that affords no basis for the claim that the First Amendment compels others—private persons or governments—to supply information."  <u>Houchins v. KOED, Inc.</u>, 438 U.S. 1, 11 (1978) (internal quotations omitted).  "Neither the First Amendment nor the Fourteenth Amendment mandates a right of access to government information or sources of information within the government's control."  <u>Id</u>. 438 U.S. at 15.

Nonetheless, the Supreme Court has since identified certain government information—criminal trials, proceedings and records—to which a First Amendment right of access does apply.  See <u>Richmond Newspapers v. Virginia</u>, 448 U.S. 555, 580 (1980);

Press-Enterprise Co. v. Superior Court, 464 U.S. 501, 505 (1984) (Press Enterprise I); Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 10 (1986) (Press-Enterprise II). Circuit courts, applying the Supreme Court's reasoning, have extended a First Amendment right of access to information in other areas of criminal proceedings as well as to information in non-criminal proceedings and documents. See United States v. Miami Univ., 294 F.3d 797, 824 (6th Cir. 2002) (university's student disciplinary board proceedings); Brown & Williamson Tobacco Corp. v. Fed. Trade Comm'n, 710 F.2d 1165, 1177–79 (6th Cir. 1983) (civil action against administrative agency); United States v. Simone, 14 F.3d 833, 842 (3d Cir. 1994) (post-trial examination of juror for potential misconduct); Whiteland Woods L.P. v. West Whiteland, 193 F.3d 177, 181 (3d Cir. 1999) (municipal planning meeting); United States v. Smith, 787 F.2d 111, 116 (3d Cir. 1986)(transcripts of sidebars or chambers conferences concerning evidentiary rulings); Publicker Idus., Inc. v. Cohen, 733 F.2d 1059 (3d Cir. 1984) (civil trial); United States v. Criden, 675 F.2d 550, 554 (3d Cir. 1982) (pretrial suppression, due process and entrapment hearings).

The Sixth Circuit has extended a First Amendment right of access to certain civil proceedings, including deportation hearings. Detroit Free Press v. Ashcroft, 303 F.3d 681, 700 (6th Cir. 2002). In doing so, the Sixth Circuit affirmed that "there is no *general* right of access to government information," but specified that there is, however, "a *limited* constitutional right to *some* government information." Id. at 700. This *limited* constitutional right applies to situations in which the press simply requests that their access to government information be "on equal footing with the public." See id. at 694–700.  No constitutional

7

right of access applies, however, to instances in which the press seeks a special privilege of access over and above that of the general public.  Id.

**Right of Access To "Information Not Otherwise Available"**

The right of access sought by *The Business Journal* and impeded by the No-Comment Policy is the ability to conduct one-on-one interviews with and receive comments from City employees.[2]  Three courts, including a decision arising from this District, faced with similar facts have classified such interviews and comments as "information not otherwise available to the public."  See Raycom National, Inc. v. Campbell, 361 F.Supp. 2d 679 (N.D. Ohio 2004); The Baltimore Sun Co. v. Ehrlich, 356 F.Supp. 2d 577 (D. Md. 2005); Snyder v. Ringgold, 40 F.Supp.2d 714 (D. Md. 1999) (Snyder II); see also Snyder v. Ringgold, No. 97-1358, 1998 WL 13528 (4th Cir. Jan. 15, 1998) (Snyder I).[3]  This set of cases concerns government officials who, in response to unflattering stories published and aired by the news media, instituted policies forbidding government employees from speaking to specific

_____

[2]The No-Comment Policy explicitly forbids City administrators and employees from making statements and commenting on behalf of the City.  (Complaint, Exhibit A).

[3]Originally, the case of Snyder v. Ringgold was brought before the U.S. Court for the District of Maryland, which granted plaintiff's motion for injunctive relief, ordering that plaintiff be given access to information or interviews given to any other members of the media.  The District Court also denied defendant's motion for summary judgment based on qualified immunity; however, on appeal, the Fourth Circuit reversed, finding that there was no clearly established constitutional right to information not otherwise available to the public.  Snyder I, 1998 WL 13528, at **1.  Upon remand to Maryland District Court, defendant, in light of the Fourth Circuit's ruling, filed a motion for reconsideration on the issue of an injunction.  Snyder II, 40 F.Supp. 3d at 714.  The Maryland District Court granted the motion for reconsideration and dissolved the injunction.  Id.

8

television and print journalists.[4]

These decisions found that enforcing media access to "information not otherwise available to the public" would be affording the media a special privilege of access over and above that of the general public.  See Baltimore Sun, 356 F.Supp. 2d at 579 ("[R]efusal[s] of officials to comment on statements of legislators, refusals to comment on contracts between private firms and the state, refusals to provide information or views for columns, refusals to provide background discussions to identify issues or topics of interest to readers, and refusals to provide personal reasons or justifications for declining comment are far beyond any citizen's reasonable expectations of access to his or her government."); Snyder II, 40 F.Supp. 2d at 718 ("No reporter has a right to access to a particular interview, exclusive story, or off the record statement."); Raycom, 361 F.Supp. 2d at 684 ("[T]he court agrees that the injunction [sought] would have the effect of conferring preferential status on [plaintiff].  The relief requested would require the mayor and other City administrators or employees who grant interviews or give statements to certain members of the media to do the same for [plaintiff's] reporters, even though the Mayor views [them] as irresponsible and

---

[4]Baltimore Sun involved a memorandum distributed by the Governor, directing employees not to speak with a particular reporter who had authored a story criticizing the governor's administration.  Baltimore Sun, 356 F.Supp. 2d at 579.  Raycom concerned an "edict" promulgated by the Mayor of Cleveland prohibiting city officials from speaking to reporters of a particular television station.  Raycom, 361 F.Supp. 2d at 681–82.  Snyder I/Snyder II involved instructions promulgated by the Director of Public Affairs for a division of the Baltimore City Policy Department refusing to give interviews to a television and print journalist who had aired a story critical of the Baltimore police department.  Snyder II, 40 F.Supp.2d at 714.

9

untrustworthy."); <u>see also</u> <u>Snyder I</u>, 1998 WL 13528, at **4 ("[T]he right of equal access for which plaintiff argues cannot be limited to members of the media without conferring a privileged First Amendment status on the press.").

Plaintiffs argue that the holdings in <u>Raycom</u>, <u>Baltimore Sun</u>, and <u>Snyder I</u>/<u>Snyder II</u> are incorrect and contend that a "tremendous amount of case law supports an opposite result." (Dkt. #17, Plaintiffs' Reply in Support of Motion for Preliminary Injunction at 8–9). Plaintiffs cite to several cases enforcing media access to public meetings, official events and designated media facilities such as press rooms.  <u>See</u> <u>United Teachers of Dade v. Stierheim</u>, 213 F.Supp. 2d 1368 (S.D. Fla. 2002) (access to a press room); <u>ABC, Inc. v. Cuomo</u>, 570 F.2d 1080, 1083 (2nd Cir. 1977) (access to post election activities at candidates' headquarters); <u>Westinghouse Broadcasting Co. v. Dukakis</u>, 409 F.Supp. 895 (D. Mass. 1976) (access to city council meetings); <u>Borreca v. Fasi</u>, 369 F.Supp. 906, 907 (D. Haw. 1974) (access to news conferences); <u>Telemundo of Los Angeles v. City of Los Angeles</u>, 283 F.Supp. 2d 1095, 1102 (C.D. Cal. 2003) (access to ceremony commemorating Mexican War).  These cases, however, do not contradict the holdings in <u>Raycom</u>, <u>Baltimore Sun</u>, and <u>Snyder I</u>/<u>Snyder II</u>.   Instead, they recognize a *limited right* of access to non-privileged information.  <u>Raycom</u>, <u>Baltimore Sun</u>, and <u>Snyder I</u>/<u>SnyderII</u>, on the other hand, affirmed that there is *no general right* of access to privileged information.

The <u>Raycom</u>, <u>Baltimore Sun</u> and <u>Snyder I</u>/<u>Snyder II</u> decisions affirmed a distinction between access to events and facilities opened to the press and access to one-on-one interviews and off-the-record comments.  For example, <u>Raycom</u>, which involved an "edict"

10

promulgated by the Mayor of Cleveland prohibiting city officials from speaking to representatives of a certain television station, examined and distinguished the case of United Teachers, 213 F.Supp. 2d at 1368, in which specific journalists were unlawfully excluded from a press room made available for media use . Raycom, 361 F.Supp. 2d at 684–85. The Court in Raycom found that the granting of one-on-one interviews and off-the-record statements was not comparable to the facts of United Teachers, because in United Teachers, government officials had effectively created a public forum—the press room—in which plaintiffs as well as other members of the press could receive comments from government officials. Id. See also Snyder II, 40 F.Supp. 2d at 717 (distinguishing the refusal to give interviews to a particular journalist from the case of Borreca, 369 F.Supp. at 907, where a reporter was denied entry to a general news conference open to all media).

Access to individual comments and off-the-record statements is privileged access to information not generally made available to entire press or the public. "If, of course, [a city official] holds a general press conference or opens certain files or records to members of the media, then whether it can exclude [a member of the press] presents an entirely different question." Snyder II, 40 F.Supp. 2d at 718. See also Westinghouse Broadcasting, 409 F.Supp. At 895 (finding that once given, "opportunities to cover official news sources must be the same for all accredited news gatherers.").

Therefore, a review of these cases reveals that a limited constitutional right of access applies only where comments by government officials are offered in a forum effectively open to all members of the press. This rule emphasizes the distinction between general and

11

privileged access to information as discussed by the Sixth Circuit in <u>Detroit Free Press</u>. 303 F.3d at 694–95. This rule also, as the Fourth Circuit noted, permits "the common and widely accepted practice among politicians of granting an exclusive interview to a particular reporter" and "equally widespread practice of public officials declining to speak to reporters whom they view as untrustworthy.…" <u>Snyder I</u>, 1998 WL 13528, at **4.

### *Application To the Instant Case*

The No-Comment Policy impedes *The Business Journal*'s access to information obtained through one-on-one interviews and off-the-record comments. The Court determines that this information is information not otherwise available to the public because the City has opened no forum inviting the public or press to solicit comments from City employees. The mere fact that a City employee may be approached or reached via telephone by any member of the press or public does not indicate that the City has opened a forum to all members of the press for the receipt of interviews and comments. Although Plaintiffs claim that *Business Journal* reporters have, for years, enjoyed access to one-on-one interviews and comments, such access, when it occurred, was privileged. Removal of this privilege does not, as Plaintiffs assert, "place [*The Business Journal*] in an inferior position to that of any other member of the public," (Dkt. #3 at 16 n.6); rather, it places *The Business Journal* "on equal footing with members of the public," <u>Detroit Free Press</u>, 303 F.3d at 700, who likewise are not guaranteed to receive comments from City employees. The fact that one newspaper or reporter may gain access to an interview or comment by a City employee does not require that all reporters be given access to the same information. A reporter may achieve privileged

12

access to government information, but a reporter does not have a constitutional right to maintain privileged access.

The Court further notes that the No-Comment Policy does not completely impede *The Business Journal* from accessing information. *The Business Journal* is able to access information provided through public records. Indeed, the No-Comment Policy, while it prohibits comments to *The Business Journal*, explicitly directs City employees to answer all questions relating to public records requests. See Detroit Free Press, 303 F.3d at 694 (discussing Houchins, 438 U.S. at 3 and emphasizing that alternative means existed for gathering information).

The Court concludes that the right of access sought by *The Business Journal* is to information not otherwise available to the public, and, therefore, is a privileged right of access above that of the general public to which no constitutional right of access applies. Id. at 695. The No-Comment Policy does not impede *The Business Journal* from engaging in a constitutionally protected activity, and Plaintiffs cannot establish this element of their First Amendment Retaliation claim. See Farmer, 295 F.3d at 599. Consequently, Plaintiffs have failed to demonstrate a likelihood of succeeding in prevailing on the merits of their claim.[5]

---

[5]The Court does note that while the No-Comment Policy may not provide a basis for a retaliation claim asserted by Plaintiff, the policy, in so far as it forbids city employees from speaking on issues of public concern, could be an unconstitutional prior restraint on speech. See Pickering v. Board of Educ., 391 U.S. 563 (1968) (holding that the speech of public employees on matters of public concern is protected under the First Amendment). Restrictions on an employee's speech violate the First Amendment where the speech at issue can be "fairly characterized as constituting speech on a matter of public concern" and the "interest of the employee, as a citizen, in commenting on matters of public concern

13

***Remaining Considerations Applicable to Preliminary Injunction***

Because the Court has concluded that Plaintiffs are not likely to succeed on the merits of their claim, the remaining three factors—irreparable injury to movant, substantial harm to others, the public interest—need not be extensively addressed. See Gonzales v. National Bd. of Medical Examiners, 225 F.3d 620, 625 (6th Cir. 2000) (noting that a finding that there is no likelihood of success on the merits is usually fatal to awarding an injunction); American Imaging Servs., Inc. v. Eagle-Pitcher Indus., Inc. (In re Eagle Pitcher Indus., Inc.), 963 F.2d 855, 862 (6th Cir. 1992) (stating that the district court is not required to make findings on factors that are not dispositive with respect to the issuance of a preliminary injunction).

Plaintiffs argue that even minimal infringements on First Amendment rights constitute irreparable harm. Newsom v. Norris, 888 F.2d 371, 378 (6th Cir. 1989) (citing Elrod v. Burns, 427 U.S. 347 (1976)). As discussed *supra*, Plaintiffs have failed to demonstrate that the No-Comment Policy infringes on their rights under the First Amendment. Moreover, Plaintiffs have not demonstrated that any First Amendment harm to them outweighs the harm

---

outweighs the interest of the state, as an employer in promoting the efficiency of the public services it performs." Jackson v. City of Columbus, 194 F.3d 737, 746 (6th Cir. 1999). See generally Koziol v. Hanna, 107 F.Supp.2d 170 (N.D.N.Y. 2000) (finding that plaintiff could bring a First Amendment Retaliation claim where mayor's "gag order" prohibiting communication to the press (1) applied to plaintiff, (2) plaintiff disobeyed the "gag order," and (3) plaintiff was subsequently forced from his position; *but also finding* that plaintiff could not bring a claim alleging the "gag order" inhibited his ability under the First Amendment to gather information for the publication of plaintiff's newsletter because, as a publisher plaintiff had suffered no injury and could still gain access to public records).

14

an injunction cause to Defendants.   See Snyder II, 40 F.Supp. 2d at 718 (noting that government officials have a First Amendment right not to speak with members of the media they deem particularly untrustworthy or irresponsible).   Finally, the Court finds that the factor of public interest does not weigh in favor of either party.

As Plaintiffs have failed to demonstrate a likelihood of sucess in prevailing on the merits of their claim and no other considerations weigh in favor of enjoining Defendants from enforcing the No-Comment Policy, Plaintiffs' Motion for Preliminary Injunction (Dkt. #6) is **DENIED**.

## III.  FAILURE TO STATE A CLAIM

"A Motion to Dismiss may only be granted if it appears beyond doubt that the Plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Ang v. Proctor & Gamble Co., 932 F.2d 540, 544 (6th Cir.1991) (citing Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).  For the purposes of a motion to dismiss, "all allegations in the complaint must be taken as true and construed in a light most favorable to the nonmovant."   Ang, 932 F.2d at 544.  While the court must accept the plaintiff's *factual* allegations as true, "[t]he trial court need not accept as true [a plaintiff's] legal conclusions." See Lewis v. ACB Bus. Servs., 135 F.3d 389, 405 (6th Cir.1998).

"As a general rule, matters outside the pleadings may not be considered in ruling on a 12(b)(6) motion to dismiss unless the motion is converted to one for summary judgment under Fed.R.Civ.P. 56." Jackson v. City of Columbus, 194 F.3d 737, 745 (quoting Weiner v. Klais & Co., 108 F.3d 86, 88 (6th Cir.1997)). There are, however, exceptions to this

15

general rule. Documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the plaintiff's claim.  Id. Courts may also consider public records, matters of which a court may take judicial notice, and letter decisions of governmental agencies.  Id.  See also Nieman v. NLO, Inc., 108 F.3d 1546, 1554 (6th Cir.1997)(public records); Lovelace v. Software Spectrum, Inc., 78 F.3d 1015, 1018 (5th Cir.1996)(judicial notice); Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1197 (3d Cir.1993)(letter decisions of governmental agencies).

Defendants argue that Plaintiffs can prove no set of facts in support of their claim that would entitle them to relief.  As discussed *supra*, Plaintiffs' Complaint sets out a claim of retaliation in violation of the First Amendment.  In order to establish retaliation for engaging in a constitutionally protected activity a plaintiff must establish: (1) that the plaintiff was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of plaintiff's constitutional rights.  Farmer v. Cleveland Public Power, 295 F.3d 593, 599 (6th Cir. 2002) (citing Bloch v. Ribar, 156 F.3d 673, 678 (6th Cir. 1998)).

Plaintiffs' Complaint asserts that Plaintiffs engaged in the following constitutional activity: publication of news reports questioning the actions of City government officials on a matter of great importance and accessing the comments of City employees.  Plaintiffs' Complaint also asserts Defendants engaged in the following actions adversely affecting the

16

alleged constitutional activities: instituting an oral policy that City employees not comment to representatives of *The Business Journal*, denying access to public records, and instituting a memorandized policy that City employees not comment to representatives of *The Business Journal*.  Plaintiffs' Complaint asserts that these adverse actions were motivated by Defendants' displeasure with criticism contained in stories published by *The Business Journal*.

First, the Court has already determined that Plaintiffs' access to one-on-one interviews with and comments from government officials is access to information otherwise unavailable to the public and is not a constitutionally protected activity.  Accordingly, Plaintiffs' assertion that accessing the comments of City employees is a constitutionally protected activity cannot form the basis of a retaliation claim.

Next, the publication of news reports questioning the actions of City government officials on a matter of great importance is a constitutionally protected activity, see Glasson v. City of Louisville, 518 F.2d 899 (6th Cir. 1975); however, Plaintiffs' Complaint states no actions which adversely affect this activity.  The oral and memorandized No-Comment policies adversely affect access to information not otherwise available to the public—information to which no constitutional right of access applies.  The policies do not otherwise adversely affect *The Business Journal*'s ability to publish news reports questioning the actions of City government officials.  Indeed, the memorandized No-Comment Policy emphasizes that access to public records and comments regarding such access must be given to all inquirers.  Likewise, Defendants' refusal, prior to December

17

2004, to comply with Plaintiffs' public records requests, does not adversely affect *The Business Journal*'s ability to publish news reports because, as the magistrate opinion attached to Plaintiff's Complaint notes, the Defendants subsequently complied with the requests.

Finally, Plaintiffs' submissions to the Court place heavy emphasis on Defendants' retaliatory motive in instituting the No-Comment Policy and attempt to argue that retaliation by public officials is itself a First Amendment violation.  (Dkt. #3 at 13–14).  It is well established that an otherwise lawful act—for example, the No-Comment Policy—can be unlawful when committed for the express purpose of infringing on another's constitutional rights.  See Perry v. Sindermann, 408 U.S. 593 (1972); Rossignol v. Voorhaar, 316 F.3d 516 (4th Cir. 2003).  It is also well established that journalists have the right to be free from retaliation for the exercise of their constitutional rights as a reporter.  McBride v. Village of Michiana, 100 F.3d 457 (6th Cir. 1996).  Nevertheless, it is not enough that Plaintiffs assert facts demonstrating that the No-Comment Policy was motivated by Mayor McKelvey and the City's displeasure with the reporting of *The Business Journal* or was an attempt to punish *The Business Journal* for such reporting.  Plaintiffs must prove facts relating to each element of their claim.  See Farmer, 295 F.3d at 599.

The Complaint fails to assert facts that would meet the elements of engagement in a constitutionally protected activity and an action adversely affecting that activity.  Plaintiffs, therefore, have failed to state facts meeting each element of a First Amendment retaliation claim, and, therefore, Plaintiffs' Complaint fails to state a claim upon which relief can be

18

granted.

Accordingly, Defendants' Motion to Dismiss (Dkt. #14) is **GRANTED**.

## IV. CONCLUSION

For the foregoing reasons the Court hereby orders that Plaintiffs' Motion For Preliminary Injunction (Dkt. #3) is **DENIED**, and Defendants' Motion to Dismiss (Dkt. #14) is **GRANTED.**


**IT IS SO ORDERED.**

 */s/ Peter C. Economus* **– 05/16/05**
**PETER C. ECONOMUS**
**UNITED STATES DISTRICT JUDGE**

19